**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT FISHER,** | : | |
|    *Petitioner,* | : | |
| | : | **CIVIL ACTION** |
|  **v.** | : | |
| | : | |
| **JEFFREY BEARD, Commissioner,** | : | |
| **Pennsylvania Department of** | : | **No. 03-788** |
| **Corrections et al.,** | : | |
|    *Respondents.* | : | |

FILED

JUL 2 5 2018

KATE BARKMAN, Clerk
By_____Dep. Clerk

**MEMORANDUM**

PRATTER, J.                                                                              JULY 25, 2018

"The Framers viewed freedom from unlawful restraint as a fundamental precept of liberty, and they understood the writ of habeas corpus as a vital instrument to secure that freedom." *Boumediene v. Bush*, 553 U.S. 723, 739 (2008). No citizen may be held in violation of the Constitution — a notion that modern iterations of the Great Writ sought to codify. Before the Court is Robert Fisher's petition for a writ of habeas corpus in which he claims that he is unconstitutionally imprisoned by the Commonwealth of Pennsylvania. The Court finds that Mr. Fisher is being held in violation of the Constitution of the United States. Therefore, the Commonwealth must either grant a new trial for Mr. Fisher or, if it declines to pursue a new criminal trial, release Mr. Fisher within 180 days.

## BACKGROUND

Robert Fisher is currently on death row for the murder of his girlfriend, Linda Rowden. A brief background of the evidence presented at trial, followed by the post-trial procedural history, is outlined below.

## I.     Trial Background[1]

In the month preceding Ms. Rowden's death, Mr. Fisher was angry with her because he believed that she had gone to the police to implicate him in the murder of a man named Nigel Anderson. Mr. Fisher's anger grew over Ms. Rowden's willingness to cooperate with authorities, and, in turn, Ms. Rowden complained to the Norristown police that Mr. Fisher had assaulted her and was harassing her. The police took a report, prepared a complaint against Mr. Fisher, and advised him to stay away from Ms. Rowden.

Even though the police intervened, the couple still spent time together. On July 10, 1980, Ms. Rowden was driving her car in Montgomery County with two passengers and the windows rolled down. A mutual friend, Richard Mayo, sat in the passenger seat; Mr. Fisher sat in the back seat. Mr. Mayo testified that Mr. Fisher and Ms. Rowden were arguing about her cooperation with the police investigation of the Anderson murder. The police suspected that Mr. Fisher had a hand in Mr. Anderson's death because Mr. Anderson was murdered before he could testify against Mr. Fisher in a federal drug possession trial. [2]

Multiple witnesses testified that, while the car was still moving, Mr. Fisher leaned forward and shot Ms. Rowden twice. The vehicle swerved to the right and crashed into parked cars lining the street. Mr. Fisher got out of the back seat and walked quickly down a side street with the gun still in his hand. Mr. Mayo immediately got out and yelled for help. He then ran to an emergency phone and called the police. An autopsy confirmed that Ms. Rowden died as a result of the shooting.

---

[1] Unless otherwise noted, the background evidence is taken from the state court opinions referred to throughout this memorandum.

[2] Eventually, Mr. Fisher was convicted in federal court of conspiracy to violate Mr. Anderson's civil rights, but that conviction was vacated for lack of evidence. *United States v. Fisher*, No. 85-cr-195-3, 1990 WL 27350 (E.D. Pa. March 12, 1990).

2

After Mr. Fisher fled the scene, he went to the apartment of his friend Denise Walker where he told Ms. Walker that he shot Ms. Rowden because she "was running her face to the detectives" about the Anderson murder. He then changed his clothes, told Ms. Walker he was leaving town, and fled the area. A subsequent search of Ms. Walker's apartment uncovered a set of Mr. Fisher's clothes and an opened box of bullets.

Mr. Fisher remained at large for seven years. He was apprehended in 1987, when he was found in New York City and extradited to Pennsylvania to stand trial for Ms. Rowden's murder. During the jury trial, Mr. Mayo and other eyewitnesses testified that Mr. Fisher shot Ms. Rowden. In September 1988, the jury convicted Mr. Fisher of first degree murder and, following a penalty-phase hearing, imposed a sentence of death. Post-trial motions were eventually denied, and the trial court formally sentenced Mr. Fisher to death on May 3, 1989.

## II. Post-Trial History

On direct appeal, the Supreme Court of Pennsylvania reversed the trial court and granted a new trial, holding that a question asked during *voir dire* of prospective jurors was prejudicial. *See Commonwealth v. Fisher*, 591 A.2d 710 (Pa. 1991) ("*Fisher-1*"),

After retrial in August 1991, a jury again convicted Mr. Fisher of first degree murder and, following a penalty-phase hearing, imposed a sentence of death. In the direct appeal that followed, the Supreme Court of Pennsylvania affirmed the conviction, but vacated the death sentence and remanded for a new sentencing hearing because of improperly admitted victim-impact evidence. *See Commonwealth v. Fisher*, 681 A.2d 130 (Pa. 1996) ("*Fisher-2*").

After a new sentencing hearing, in which a third jury determined that Mr. Fisher should be sentenced to death, the trial court formally sentenced him to death on July 23, 1997. On direct appeal, the Supreme Court of Pennsylvania affirmed the sentence of death. *Commonwealth v.*

3

*Fisher*, 741 A.2d 1234 (Pa. 1999) ("*Fisher-3*"). In February 2000, the Supreme Court of Pennsylvania denied re-argument, and the U.S. Supreme Court denied *certiorari. Fisher v. Pennsylvania*, 531 U.S. 829 (2000). Mr. Fisher validly exhausted his state PCRA claims, *Commonwealth v. Fisher*, 813 A.2d 761 (Pa. 2002) (*Fisher-4*), and filed this petition for a writ of habeas corpus on December 3, 2003.

In the petition, Mr. Fisher raised 22 separate claims. Here, however, the Court will assess only three of those claims, which the Court finds to be meritorious, to give guidance to the state court in a potential retrial. The Court declines to discuss the viability of the remaining claims, and expresses no view on their merit.

## STANDARD OF REVIEW

The Great Writ is a longstanding check on executive power. Initially, "early courts were considered agents of the Crown, designed to assist the King in the exercise of his power." *Boumediene*, 553 U.S. at 740. But over time, "the writ was deemed less an instrument of the King's power and more a restraint upon it." *Id.* at 741. Today, the writ of habeas corpus is largely governed by the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2241 *et seq*. AEDPA tempers the review of federal claims by federal courts with deference to state court determinations of those claims fairly presented to the state court. Although most of Mr. Fisher's claims were fairly presented to the state court and deserve deference under 28 U.S.C. § 2254, Mr. Fisher argues that claims addressed in *Fisher-4* require *de novo* review. The Court first discusses § 2254 deference before addressing Mr. Fisher's *de novo* review argument. Ultimately, the Court finds that all of the claims must be analyzed under § 2254.

4

## I.    Section 2254 Deference

For claims "adjudicated on the merits" in state court, a federal court may grant a writ of habeas corpus only if the state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision can be contrary to Supreme Court precedent in two ways: (1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or (2) "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to [the Supreme Court]." *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000).

A state court decision involves an unreasonable application of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Id.* at 407. "[F]or a reviewing federal court to find a state court's application of Supreme Court precedent 'unreasonable,' the state court decision must be 'more than incorrect or erroneous;' it must have been 'objectively unreasonable.'" *Marshall v. Cathel*, 428 F.3d 452, 462 (3d Cir. 2005) (quoting *Wiggins v. Smith*, 539 U.S. 510, 520 (2003)). Furthermore, the law must have been clearly established at the time of the relevant state court decision. *Williams*, 529 U.S. at 412. This analysis of state court determinations is circumscribed to accord appropriate deference to the state court.

5

AEDPA's deferential standards of review do not apply "unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States." *Jacobs v. Horn*, 395 F.3d 92, 100 (3d Cir. 2005) (quoting *Everett v. Beard*, 290 F.3d 500, 508 (3d Cir. 2002)). If AEDPA provisions are inapplicable, "federal habeas courts apply pre-AEDPA standards of review." *Id.* This pre-AEDPA review requires "federal habeas courts [to] conduct[] a *de novo* review over pure legal questions and mixed questions of law and fact." *Thomas v. Varner*, 428 F.3d 491, 497 (3d Cir. 2005) (quoting *Jacobs*, 395 F.3d at 100).

## II.    *Fisher-4* Claims

The *Fisher-4* opinion denying Mr. Fisher's second PCRA claim never produced a majority opinion, with four separate concurrences and a partial dissent for the fractured court. *See Commonwealth v. Fisher*, 813 A.2d 761 (Pa. 2002). Mr. Fisher argues that this means the claims addressed there deserve a *de novo* review rather than deference under AEDPA.[3] He argues that, because there was only a plurality opinion, there is nothing to defer to. The Court disagrees and determines that *Fisher-4* claims must be analyzed under § 2254.

Deference under AEDPA is robust. Thus, a state court receives deference even when it has not issued an opinion. *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Where "a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Id.* at 98. Even when "a federal claim has been presented to a state court and the state court has denied relief, it may be

---

[3] This argument does not affect exhaustion hurdles. *See* page 45, *infra*.

presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

The Supreme Court recently addressed a similar issue in *Wilson v. Sellers*, 138 S. Ct. 1188 (2018). The Court held that even in summary affirmances, the federal court must "look through" the state court opinion to the next highest state court to address the issue. *Id.* at 1190; *see also Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991) (unexplained orders upholding a judgment of a lower court are presumed to rest on the same ground). In those cases, the principles underlying AEDPA still require the Court to defer to the state courts who have not meaningfully addressed the issue.

In the present case, the state court did far more than simply issue a summary affirmance. Instead, the court wrote a twenty-page decision addressing each issue in Mr. Fisher's PCRA petition. *Fisher-4*, 813 A.2d at 761. The fact that certain jurists within the court diverged on some questions is of no moment. The Court here must merely determine whether the state court adjudication was unreasonable. This case presents an issue of first impression. The Third Circuit Court of Appeals and Supreme Court have yet to address the precise question presented here, of how a federal court must grapple under AEDPA with a plurality opinion in the state court. However, the Supreme Court has held that deference is warranted even in cases that provide less reasoning than the present case. Therefore, the Court finds that deference under § 2254 is warranted for all claims here, including the *Fisher-4* claims that only have a plurality opinion. The Court now turns to the sentencing phase claims before addressing the sole meritorious guilt phase claim.

7

## I. *Ex Post Facto* Aggravating Circumstances

Mr. Fisher first argues that his sentencing phase violated the *Ex Post Facto* Clause. Mr. Fisher was sentenced to death because a jury found that a sole aggravating factor outweighed a sole mitigating factor. But the statute providing for the sole aggravating factor was not enacted by the Pennsylvania legislature until well after Mr. Fisher's crime. In determining whether this retroactive application presented an *ex post facto* issue, the Supreme Court of Pennsylvania held that the new provision was substantially similar to an old provision in place when the crime was committed. The state court concluded that this similarity meant that there was no *ex post facto* issue. *Fisher-3*, 741 A.2d at 1240.

Because there are substantial differences between the two statutory provisions, the Court concludes that (1) the state court's determination was an unreasonable application of established Supreme Court precedent regarding the *Ex Post Facto* Clause and (2) the state court opinion relying on state law is not a bar to relief. Therefore, as explained *infra*, the Court grants the writ on this ground regarding Mr. Fisher's sentencing phase.

### A. Relevant Procedural History

Ms. Rowden was murdered in 1980. After seven years on the lam, Mr. Fisher was arrested in 1987 and convicted in 1991. After numerous sentencing appeals, he was sentenced to death in 1997 (17 years after the murder) on the basis of a sole aggravating factor, 42 PA. CONS. STAT. § 9711 (d)(15) (1989), which was enacted after the murder. The Supreme Court of Pennsylvania found that this statutory provision was substantially similar to 42 PA. CONS. STAT. § 9711(d)(5) (1980), a factor that was in place at the time of the murder.

These modifications were not the only changes in the relevant legal landscape. The Supreme Court of Pennsylvania also changed its interpretation of the original (d)(5) aggravating factor in a way that affects the validity of Mr. Fisher's sentence. Therefore, there are two questions the Court must answer. First, was (d)(15) applicable to Mr. Fisher? Second, if it was not, which (d)(5) interpretation should have been applied to him?

### *1. Legislative Amendment to Aggravating Circumstances*

The Pennsylvania death penalty statute in place at the time of the murder set forth ten aggravating circumstances. *See* 42 PA. CONS. STAT. § 9711(d) (1980). Nine years later, the statute was amended to include eight additional aggravating circumstances. *See* 42 PA. CONS. STAT. § 9711(d) (1989). Mr. Fisher was sentenced under one of the new aggravating circumstances. In finding that there was no *ex post facto* issue, the Supreme Court of Pennsylvania found that the new aggravator, (d)(15) was "substantially similar" to the old aggravator, (d)(5).

The relevant aggravating circumstance in place at the time of the murder required the prosecution to prove that:

> [t]he **victim was a prosecution witness to a murder or other felony committed by the defendant** and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding *involving such offenses.*

42 PA. CONS. STAT. § 9711(d)(5) (1980) (emphases added for comparison). In 1989, the legislature expanded the death penalty statute, adding a more expansive aggravating factor to the scheme. This new factor requires the prosecution to prove that:

> [a]t the time of the killing, **the victim was or had been a nongovernmental informant or had otherwise provided any investigative, law enforcement, or police agency with information concerning criminal activity** and the defendant

9

> committed the killing . . . in retaliation for the victim's activities as
> a nongovernmental informant or in providing information
> concerning criminal activity to an investigative, law enforcement,
> or police agency.

42 PA. CONS. STAT. § 9711(d)(15) (1989) (emphases added for comparison).

### 2. *Judicial Interpretation Shift*

In addition to this legislative amendment, the Supreme Court of Pennsylvania enlarged the scope of (d)(5) in 1988. Even though earlier cases had interpreted the factor to apply only to "pending" criminal cases, *see Commonwealth v. Caldwell*, 532 A.2d 813, 817 (Pa. 1987), the Court broadened its interpretation to include cases that did not have a pending criminal action. *Commonwealth v. Appel*, 539 A.2d 780, 784 n.2 (Pa. 1988). Significantly, this broadening happened after Ms. Rowden's murder, but before Mr. Fisher's sentencing. Mr. Fisher also argues that the (d)(5) factor must be interpreted the way it was interpreted in 1980.

### B. *Ex Post Facto* Standard

The *Ex Post Facto* Clause "safeguards 'a fundamental fairness interest . . . in having the government abide by the rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life.'" *Peugh v. United States*, 569 U.S. 530, 544 (2013) (quoting *Carmell v. Texas*, 529 U.S. 513, 533 (2000)). "[T]wo critical elements must be present for a criminal or penal law to be *ex post facto*: it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *United States v. Kruger*, 838 F.3d 786, 790 (6th Cir. 2016).

In 1798, the Supreme Court articulated four categories of retroactive legislation prohibited by the *Ex Post Facto* Clause. These categories still govern its reach. *Stogner v.*

*California*, 539 U.S. 607, 611 (2003) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 396 (1798)).

The four categories are:

> [1] Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action.
>
> [2] Every law that aggravates a crime, or makes it greater than it was, when committed.
>
> [3] Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed.
>
> [4] Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender. All these, and similar laws, are manifestly unjust and oppressive.

*Calder*, 3 U.S. (3 Dall.) at 390–91; *see also Stogner*, 539 U.S. at 612; *United States v. Brennan*, 326 F.3d 176, 197 (3d Cir. 2003).

The Supreme Court has clarified these four categories by creating three tests to determine if the *Ex Post Facto* Clause has been violated. A law is unconstitutional if it "(1) punishes as a crime an act that was innocent when done, or (2) makes more burdensome the punishment for a crime after its commission, or (3) deprives one charged with a crime of any defense available according to law at the time the act was committed." *Helton v. Fauver*, 930 F.2d 1040, 1045 (3d Cir. 1991) (citing *Beazell v. Ohio*, 269 U.S. 167, 170 (1925)). In this instance, the second test applies, because the aggravating factor makes the punishment of Mr. Fisher more burdensome.

### C. Section 2254 Arguments

The state court relied on two strands of argument in determining there was no *ex post facto* issue. The first strand is a straightforward analysis of the *Ex Post Facto* Clause, which receives deference under § 2254(d). The second strand relies on state interpretations of state law,

11

which is reviewed under a different standard. The Court will first address arguments deserving of § 2254 deference before moving on to the state interpretations of state law.

### *1. Commonwealth's* Ex Post Facto *Analysis*

As a threshold matter, the Commonwealth does not attempt to rely on the state court's reasoning to dispute Mr. Fisher's petition.[4] Instead, it argues that aggravating factors are exempt from the *Ex Post Facto* Clause because aggravators are procedural changes rather than substantive ones. The Commonwealth is correct that "[t]he inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed." *Gibson v. Mississippi*, 162 U.S. 565, 590 (1896). But a purportedly procedural change becomes substantive when it affects the "substantial personal rights" of the individual. *Malloy v. South Carolina*, 237 U.S. 180, 183 (1915). A defendant's substantial personal rights are violated if the change constitutes a "change in the quantum of punishment attached to the crime." *Dobbert v. Florida*, 432 U.S. 282, 294 (1977). Here, Mr. Fisher was sentenced to death — as opposed to life without parole — following this change. Therefore, this application of (d)(15) violates the *Ex Post Facto* Clause.

The Commonwealth contends that the penalty for murder has always been prison or death, and that changing the aggravating and mitigating circumstances is merely tweaking the procedure for choosing the sentence without actually changing the penalties for murder. The Court rejects this attempt to play down the significance of the change. The Supreme Court's second definition of an *ex post facto* law is: "Every law that aggravates a crime, or makes it

---

[4] The state court reasoning is addressed in Sections I.C.2 & I.D., *infra*.

greater than it was, when committed." *Calder*, 3 U.S. (3 Dall.) at 390. That is precisely what has happened here.

Adding an aggravating circumstance directly increases the possible penalties for Mr. Fisher. The Commonwealth argues that this is not so, because the statutory scheme always allowed a death sentence for the crime. This argument is disingenuous. For example, under the Commonwealth's reading, a state could make every crime carry a penalty that ranges from a monetary fine to a death sentence, and then simply alter the sentencing schemes for different crimes after the crimes have been committed. In that situation, under the Commonwealth's reading, even sentencing schemes that are changed after crimes are committed could be retroactively applied because they are merely "procedural changes." The Commonwealth argues that this would be permissible, because defendants were "always subject to death or life imprisonment as a penalty." Comm. Br. at 29. That type of semantic distinction or sleight of hand cannot be the rule under the *Ex Post Facto* Clause. Moreover, the statutory scheme requires that certain aggravators be proven beyond a reasonable doubt before an individual can be put to death, undercutting the Commonwealth's own assertion that aggravating factors are not substantive.

Moreover, the Commonwealth's reasoning flies in the face of the entire rationale underpinning the *Ex Post Facto* Clause. The *Ex Post Facto* Clause was enacted in response to oppressive British laws that criminalized conduct retroactively, in an effort to advance corrupt ends. James Madison explained that "*ex post facto* laws . . . are contrary to the first principles of the social compact and to every principle of sound legislation." THE FEDERALIST NO. 44 (James Madison). The Clause was enacted as a "bulwark in favor of personal security and private rights." *Id.* The American colonists saw, "with regret and indignation, that sudden changes and

13

legislative interferences, in cases affecting personal rights, become jobs in the hands of enterprising and influential speculators, and snares to the more-industrious and less informed part of the community." *Id.*

In other words, the Framers perceived *ex post facto* laws as a threat, precisely because they could be a massive sword wielded via the whims of the legislature. The Framers knew that "the Parliament of Great Britain claimed and exercised a power to pass such [*ex post facto* and bill of attainder] laws," *Calder*, 3 U.S. (3 Dall.) at 389, and "viewed the prohibition on *ex post facto* legislation as one of the fundamental protections against arbitrary and oppressive government." *California Dep't of Corr. v. Morales*, 514 U.S. 499, 515 (1995). The Commonwealth's reading inherently contradicts this principle. Under the Commonwealth's reading, a disfavored "part of the community" is subject to the whims of "legislative interferences" with established law. THE FEDERALIST NO. 44 (James Madison). Such a reading ignores the genesis of the *Ex Post Facto* Clause.

Therefore, the Commonwealth's application of a new aggravating factor in Mr. Fisher's sentencing is an *ex post facto* application as defined in *Calder*, and the Commonwealth's argument here is without merit. To the extent the state court relied on this interpretation, it would be an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d)(1).

### 2. State Court's Ex Post Facto *Analysis*

The Supreme Court of Pennsylvania advances three main arguments for why the application of (d)(15) does not violate the *Ex Post Facto* Clause, each of which differ from the reading urged by the Commonwealth.[5] The first two rationales are outlined below and deserving

---

[5] The Court dismisses any arguments not otherwise addressed in this opinion as meritless.

14

of AEDPA deference. However, both explanations are ultimately unreasonable applications of established United States Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1).

**First**, the state court explains that, because Mr. Fisher's conviction was overturned and remanded for retrial after the law had been changed, the new law must be applied to the new trial. *Fisher-3*, 741 A.2d at 1241. This rationale directly contradicts *Calder*, which requires that the law *at the time of the alleged offense* apply at trial. *Calder*, 3 U.S. (3 Dall.) at 390–91. But the Supreme Court of Pennsylvania reasoned that the law *at the time of trial* governs. This reasoning runs counter to hornbook law; the *Ex Post Facto* Clause seeks to limit exactly that type of prosecution. Otherwise, states could enact laws that criminalize previously legal conduct between the commission of an offense and the trial.

**Second**, in equating (d)(5) and (d)(15), the state court argued that because (d)(15) encompasses more situations than (d)(5), proof under (d)(15) necessarily means that the prosecution has proven (d)(5). *Fisher-3*, 741 A.2d at 1240.[6] The state court's logic is exactly backward. Consider an analogy: just as (d)(15) encompasses more situations than (d)(5), Pennsylvania encompasses more land than Philadelphia. It would be correct to say that, if you have proven (d)(5), you have proven (d)(15), just as it would be correct to say that if a someone is in Philadelphia, the person is necessarily in Pennsylvania. However, the state court flipped the order. The state court argued that by proving (d)(15), the prosecutor had necessarily proven (d)(5), which would be the same as claiming that, simply because a prosecutor proved someone was in Pennsylvania, the prosecutor proved that the person was in Philadelphia. This is patently

---

[6] Specifically, the court explained that "section (d)(15) requires that the victim was a nongovernmental informant or had otherwise provided any investigative, law enforcement or police agency with information concerning criminal activity. The victim may or may not be a witness [as required by (d)(5)] and the criminal activity may or may not be a felony or murder [as required by (d)(5)]." *Fisher-3*, 741 A.2d at 1240.

untrue. The person could be in Harrisburg or Pittsburgh, or thousands of other places. This argument is wrong as a matter of elementary logic, much less established Supreme Court precedent.

For these reasons, the state court determination that the use of (d)(15) did not violate the *Ex Post Facto* Clause was an unreasonable application of established Supreme Court precedent and does not survive § 2254(d) scrutiny. Were there no question of state law, this conclusion would end the matter and Mr. Fisher would be entitled to relief. However, the state court also decided the question by interpreting mitigating factor (d)(15) as substantially similar to (d)(5). This move effectively converted the remaining argument advanced by the state court into one that rested on an interpretation of state law. Therefore, the Court must analyze how to review a state court's interpretation of state law in the federal habeas context.

## D. State Court Argument Resting on State Law Interpretation

Although the state court's first two arguments deserve AEDPA deference, the third does not. The third argument advanced by the state court was that (d)(15) is substantially similar to (d)(5), which meant that there was no *ex post facto* issue. This is an interpretation of state law. Given that the state evaluation of the *ex post facto* question rested on an interpretation of state law, the Court here is no longer assessing the state court opinion solely under the AEDPA rubric. The Court must presume that the state court's interpretation of its own state law is correct and merely determine whether that interpretation of state law, enunciated after the crime was committed, violates the *Ex Post Facto* Clause. *Harris v. Reed*, 489 U.S. 255, 262 (1989) (holding that the adequate and independent state law doctrine applies to federal habeas cases). Although the state court's determination of state law is for the state courts to determine, the federal court

16

still must determine whether the change in state law wrought by the state court violates the *Ex Post Facto* Clause.

In the *ex post facto* context, the question of whether a federal court must defer to the state court's statutory interpretation turns on whether the state court's interpretation was foreseeable. An "unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law, such as Art. I, § 10 of the Constitution forbids." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). Thus, the relevant inquiry collapses into one question: was the state court interpretation foreseeable? If it was, the state determination controls. If it was not, Mr. Fisher's rights have been violated and Mr. Fisher must receive a new sentencing hearing.

Here, the state court did not explicitly grapple with the issue of whether its determination of "substantial similarity" was foreseeable. The court simply concluded that the substantial similarity meant that there was no *Ex Post Facto* Clause violation. Although the state court did not explicitly say as much, the Court finds that the state court implicitly regarded its "substantial similarity" conclusion to be foreseeable. It would certainly be anomalous for a reasonable court to find that its own legal conclusion was *unforeseeable*. Thus, even though the state court did not discuss the issue of foreseeability outright, the Court "presume[s] that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 562 U.S. 86, 99 (2011). Given that the question of foreseeability here is a federal law question, the Court finds that the Supreme Court of Pennsylvania unreasonably found that its 1999 holding was foreseeable to a potential criminal in 1980. 28 U.S.C. § 2254(d)(1).

17

To further complicate the matter, the Supreme Court of Pennsylvania has interpreted (d)(5) in three different ways over the past 28 years. First, there was (d)(5) as interpreted when the crime was committed in 1980. Second, there was the changed judicial construction of (d)(5) in 1988 — after the crime, but before Mr. Fisher's sentence. Finally, there was the interpretation enunciated by the state court in the opinion addressing Mr. Fisher's PCRA petition, holding that (d)(15) is "substantially similar" to (d)(5). *Fisher-3*, 741 A.2d at 1240.

Of the three different interpretations, the Court finds that the first two do not violate the *Ex Post Facto* Clause of the Constitution, but that the final interpretation — that (d)(5) is substantially similar to (d)(15) — violates the Clause. To arrive at that answer, the Court must answer two questions in turn: *First,* whether the 1988 judicial interpretation of (d)(5) was foreseeable in 1980 when the crime was committed; and *second,* whether the interpretation in this case — that (d)(15) is substantially similar to (d)(5) — was foreseeable in 1980. The Court finds that the answer to question (1) is yes — the 1988 interpretation is foreseeable — and the answer to question (2) is no — interpreting (d)(15) as the same as (d)(5) is unforeseeable. Because the sentencing jury only found that (d)(15) was met here, the Court's holding today necessitates that Mr. Fisher receive a new sentencing hearing.

### *1. Change 1: 1987 Judicial Change of (d)(5)*

As discussed above, the first change in the Supreme Court of Pennsylvania's interpretation of the (d)(5) aggravating factor occurred in 1988 when the court enlarged the scope of crimes encompassed under the factor. Although earlier cases had interpreted the factor to apply only to murdered witnesses in pending criminal cases, *see Caldwell*, 532 A.2d at 817, the Supreme Court of Pennsylvania broadened its interpretation in 1988 to include cases that did not have a pending criminal action. *Appel*, 539 A.2d at 784 n.2.

18

As interpreted for most of the 1980s, (d)(5) required the prosecution to show evidence that would "establish that the victim was a prosecution witness who was killed to prevent his testimony in a pending grand jury or criminal proceeding." *Caldwell*, 532 A.2d at 817. In the 1988 *Appel* decision, the Supreme Court of Pennsylvania changed course. In *Appel*, the court found that, although there was no criminal proceeding pending, the murder of a bank teller during a robbery was done to prevent the witness victim from testifying during a future trial for the robbery. In explaining why the Supreme Court of Pennsylvania allowed (d)(5) to apply in the *Appel* case, even though there was no pending criminal proceeding, the court reasoned that the "pending" requirement was a judicial construction that "served to limit the application of that section to clear instances where the requisite animus was present." *Appel*, 539 A. 2d at 784 n.2. In *Appel*, the Supreme Court of Pennsylvania found it "clear that the requisite animus was present, since the predesigned purpose for the killings was to eliminate the potential of witnesses in a prosecution against appellant and his accomplice." *Id.*

Thus, the *Appel* court removed the judicially created requirement that there be a "pending" prosecution for factor (d)(5) to apply. But the *Appel* decision post-dated Mr. Fisher's alleged crime. Therefore, he argues that the change in law enunciated in 1988 cannot apply to a murder that happened in 1980 and that the requirement of the "pending prosecution" must apply to him. He claims that because there was no pending prosecution in his case, even (d)(5) would not suffice as an aggravating circumstance.

Without an *ex post facto* issue here, the interpretation of (d)(5) would be a question of state law and, therefore, a question for the state court to determine. Federal courts do not sit to determine state law and are bound by the authoritative pronouncements of the highest court in the state. However, the Court here is called upon to determine if the 1988 judicial interpretation

19

of (d)(5) violates the *Ex Post Facto* Clause. An "unforeseeable judicial enlargement of a criminal statute, applied retroactively, operates precisely like an *ex post facto* law." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). The question for the Court here is whether this changed interpretation of the law was "foreseeable." In other words, the question is whether a potential law-breaker would be on notice of this changed judicial construction. *See Helton v. Fauver*, 930 F.2d 1040, 1047 (3d Cir. 1991) (finding that applying a judicial opinion post-dating a crime violated the *Ex Post Facto* Clause because the statute and earlier cases "could not have put [the defendant] on notice of, or made reasonably foreseeable, the shift in direction and the change in law" effected by the state court after the crime was committed); *Coleman v. Saffle*, 869 F.2d 1377, 1386 (10th Cir. 1989) ("An unforeseeable judicial interpretation that makes a crime greater than when it was committed, or that inflicts a greater punishment than the law permitted when the crime was committed, violates *ex post facto* principles and a defendant's due process rights.").

The Court finds that this shift in judicial interpretation does not violate the *Ex Post Facto* Clause. In fact, the Supreme Court of Pennsylvania's 1988 change brought its interpretation *more* in line with the statutory text than the previous "pending" prosecution requirement. The statute requires that the victim is "killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding involving such offenses." 42 PA. CONS. STAT. § 9711(d)(5) (1980). This phrase does not require (or imply) that the Commonwealth has already initiated the proceedings where the victim is a witness. Instead, it focuses entirely on the defendant's motive. Thus, a plain reading of this provision would cover, for example, a defendant who kills someone under the mistaken belief she is a witness in his pending trial, *even if there was no pending trial*. The statute's focus on the defendant's motive means that the

20

requirement of an actual "pending" prosecution requirement stretched too far — a distinction that the Supreme Court of Pennsylvania foreseeably clarified in 1988.

Therefore, contrary to Mr. Fisher's argument, the 1988 judicial shift in interpretation was foreseeable, and did not violate the *Ex Post Facto* Clause. However, the Court's holding on this point stops there. It is the province of the state court, not a federal court, to determine how to interpret the (d)(5) aggravator, because the *Ex Post Facto* Clause is not implicated in these two state court interpretations of (d)(5). The Court merely rejects Mr. Fisher's argument that the 1988 interpretation of (d)(5) somehow runs afoul of the United States Constitution.

*2. Change 2: Interpretation that (d)(5) and (d)(15) are Substantially Similar*

However, when considering the state court's interpretation equating (d)(5) to (d)(15), the same does not hold true. In assessing Mr. Fisher's PCRA petition, the Supreme Court of Pennsylvania interpreted the two aggravating circumstances, (d)(5) and (d)(15), as "similar in substance." *Fisher-3*, 741 A.2d at 1239. This effectively represented another judicial change in the interpretation of (d)(5). In finding that these two statutory provisions were substantially identical, the Supreme Court of Pennsylvania held that the application of (d)(15) to Mr. Fisher did not violate the *Ex Post Facto* Clause. Although a federal court is "bound by a state supreme court's construction of a state penal statute," it is not "bound by the state court's determination as to whether its construction offends the federal Constitution." *Helton*, 930 F.2d at 1044.

The Court finds that the state court's interpretation that the two provisions are substantially similar was unforeseeable and violates the Constitution. The state court interpreted "retaliation for informing or providing information concerning criminal activity" as substantially similar to "killing for the purpose of preventing the witness' testimony." In assessing whether a

21

state court interpretation of a state law contradicts the *Ex Post Facto* Clause, the Court must determine if this interpretation is foreseeable. If it is, the state court's interpretation stands. If not, the claim must be reviewed under § 2254 deference to see if the state court's implicit determination of foreseeability was an "unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Once again, the Court presents the two sections at issue, with their relevant sections formatted the same way, pairing like clauses together:

> The **victim was a prosecution witness to a murder or other felony committed by the defendant** and was killed for the purpose of preventing his testimony against the defendant in any grand jury or criminal proceeding *involving such offenses.*

42 PA. CONS. STAT. § 9711(d)(5) (1980) (emphases added for comparison).

> At the time of the killing, **the victim was or had been a nongovernmental informant or had otherwise provided any investigative, law enforcement, or police agency with information concerning criminal activity** and the defendant committed the killing . . . in retaliation for the victim's activities as a nongovernmental informant or in providing information concerning criminal activity to an investigative, law enforcement, or police agency.

42 PA. CONS. STAT. § 9711(d)(15) (1989) (emphases added for comparison). These aggravating factors have three key differences that make it unforeseeable that they would be equated by the state court.

*First, (d)(15) expanded the universe of potential victims.* Section (d)(5) required the victim to be a "prosecution witness to a . . . felony committed by the defendant," but (d)(15) requires the victim only to be someone who had provided authorities with "information concerning criminal activity." Therefore, the universe of victims in section (d)(5) is far smaller than those under (d)(15). Section (d)(5) requires the victim to be a witness to a crime committed

22

by the defendant, but (d)(15) encompasses informants as to any crime, such as a testifying witness in an unrelated proceeding, or a non-testifying government informant.

Not only that, but although (d)(5) required that the victim "was . . . a witness" to a crime, 42 PA. CONS. STAT. § 9711(d)(5) (1980), (d)(15) required that the victim "was *or had been* [an] informant." 42 PA. CONS. STAT. § 9711(d)(15) (1989) (emphasis added). This added phrase shows that (d)(15) encompasses killings done in retaliation for testimony even after the criminal process had ended, whereas (d)(5) does not contain the added language.

*Second, (d)(15) requires a different motive.* Section (d)(5) requires the killing to be done to "prevent[] testimony against the defendant in any grand jury or criminal proceeding." This language is more expansive in (d)(15), which encompasses killings done in "retaliation" for "activities" as an informant. This changes the requisite motive attributable to the defendant. The Commonwealth must prove under (d)(5) that the defendant did this to *prevent* testimony, but no such requirement exists in (d)(15). The killing can be purely retaliatory. Thus, the new (d)(15) provision encompasses a broader swath of crimes, and the jury need not find the same motive as it would find for (d)(5).

*Finally, (d)(15) eliminated the requirement that the killing had to relate to a crime the defendant himself had committed.* The new aggravating factor could be met even if the victim was killed for being an informant for a third party's crimes. Although (d)(5) required the killing to relate to the defendant's crimes, this requirement is not present in (d)(15). This means that (d)(15) is broader than (d)(5) and covers more crimes than (d)(5) previously had.

Even the context of the statutory scheme points to dissimilarities. For example, when the legislature amended the aggravating factors, the legislature merely added (d)(15); it did not eliminate (d)(5). Thus, the original (d)(5) is still in force. Interpreting these factors as having

23

coterminous meanings would entail the conclusion that one of these provisions "is mere surplusage, is entirely without meaning, if such is to be the construction." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 174 (1803). Courts generally do not interpret statutory provisions as duplicative, especially ones with such glaring differences. Given that (d)(15) is so much broader than (d)(5), and the two provisions still co-exist, the state court's determination that the two are substantially similar cannot be a foreseeable extrapolation of the aggravating circumstance. This entitles Mr. Fisher to relief.

### E. Harmless Error

The Commonwealth argues that any error was harmless and could not have "substantial and injurious effect" as required by *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). *Cf Kotteakos v. United States*, 328 U.S. 750, 776 (1946) (using the same standard). In support, the Commonwealth points to previous sentencing phases where prior juries found that the (d)(5) aggravating factor was met. But those sentencing phases were overturned in previous cases for various infirmities and are therefore suspect. The Court cannot rely on those proceedings to show that there was no substantial and injurious effect here. After all, past courts overturned those sentences precisely because they found that the violations amounted to more than mere harmless error. To rely on these flawed sentencing phases would give weight to proceedings of questionable validity.

The Court declines to walk down such a treacherous path. Given that there was only one aggravating factor, the Court finds that the use of that factor to sentence Mr. Fisher resulted in "actual prejudice" and "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 638.

24

Perhaps the state court opinion holding that (d)(5) and (d)(15) are "substantially similar" could also be read as determining that it was harmless error to instruct the jury on (d)(15) instead of (d)(5). In essence, the state court argued that because the facts proved at trial likely would have satisfied (d)(5), the fact that the jury was given (d)(15) satisfied the harmless error standard. *See Chapman v. California*, 386 U.S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.). An error is not harmless if the error prejudices the defendant. *Fahy v. Connecticut*, 375 U.S. 85, 86 (1963). To find an error harmless — that is, to allow a sentence to stand despite a constitutional infirmity — a court must determine that the error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24.

Federal courts are split on whether *ex post facto* violations are subject to harmless error review. *Compare Williams v. Roe*, 421 F.3d 883, 888 (9th Cir. 2005) (finding that *ex post facto* violations have a *per se* "substantial and injurious" effect on sentencing and cannot be harmless), *with Jennings v. McDonough*, 490 F.3d 1230, 1253 (11th Cir. 2007) (finding harmless error in an *ex post facto* violation). The Court accepts that *ex post facto* errors can indeed be harmless.[7] However, the error here was not harmless beyond a reasonable doubt, and it was unreasonable for the state court to find that it was. Because there was only one aggravating circumstance found by the jury, the state court opinion, in effect, found the error harmless beyond a reasonable doubt by (1) substituting a similar aggravating circumstance in place of the flawed one, (2) finding that a jury would have found (d)(5) was proven beyond a reasonable doubt from the facts presented

---

[7] For example, any error would have been harmless beyond a reasonable doubt if the jury had found other aggravating circumstances and no mitigating circumstances. In that situation, when there is at least one aggravating circumstance and no mitigating circumstance, Pennsylvania law would still mandate the death penalty. 42 PA. CONS. STAT. § 9711(c)(iv).

25

for (d)(15), (3) re-weighing the new factor against the mitigating circumstance, and (4) concluding that a jury would have sentenced Mr. Fisher to death. This level of speculation is unreasonable under established Supreme Court precedent, *see* 28 U.S.C. § 2254(d)(1), because it requires far too many interdependent inferences for it to be logically reliable.

The record before the state court on the facts relevant to (d)(5) was incomplete. Mr. Fisher was never given notice that he needed to respond to (d)(5), and a reviewing court has no way of knowing how putting (d)(5) "in play" would have changed Mr. Fisher's defense. The Court cannot engage in the fraught exercise of determining how Mr. Fisher might have challenged (d)(5) had it been argued to the jury, and how that jury would have determined the facts in light of the new evidence. For example, perhaps Mr. Fisher would have disputed the motive for the murder, or maybe he would have presented evidence that Ms. Rowden was an informant only, and never planned to testify. Neither defense changes the outcome under (d)(15), but both would exculpate Mr. Fisher under (d)(5). The Court cannot rule out either scenario, and certainly cannot do so beyond a reasonable doubt. Nor could the state court have done so reasonably.

Although harmless error often requires counterfactual analysis by the reviewing court, it does so based on the record of the case. However, the record here is incomplete. It is impossible for the Court to undertake such a counterfactual analysis because Mr. Fisher was never given an opportunity to rebut (d)(5). Therefore, because the error was not harmless beyond a reasonable doubt, and it was an unreasonable application of established federal law for the state court to find otherwise, *see* 28 U.S.C. § 2254(d)(1), *Fahy*, 375 U.S. at 86, the Court grants Mr. Fisher's writ of habeas corpus on this ground.

26

## II.    Ineffective Assistance of Counsel

Mr. Fisher's most extensive claim is that his counsel was ineffective for failing to investigate or present a variety of evidence during the sentencing hearing. His arguments fall into three main categories. His first two claims are counsel's failure to investigate mental health evidence and Mr. Fisher's military record. His third claim is that although counsel investigated intoxication evidence, Mr. Fisher's counsel was ineffective for failing to present it at trial. The state court determined that Mr. Fisher's counsel was not ineffective because he (1) pursued leads, (2) allowed Mr. Fisher to testify as to his mental deficiencies, and (3) was asked by Mr. Fisher not to have family members testify. Despite this determination, the Court finds that Mr. Fisher's claim of ineffective assistance of counsel was not adjudicated on the merits in state court because he was never given funds to investigate the question. Therefore, this reasoning by the state court deserves no deference.

Reviewing the claim *de novo*, the Court finds that counsel's failure to investigate Mr. Fisher's mental health or military record constituted ineffective assistance of counsel. Case law makes clear that sentencing counsel must pursue avenues of potentially mitigating mental health evidence, and the Court finds that counsel's failure constitutes deficient performance. However, as to the intoxication evidence, Mr. Fisher's counsel investigated the issue and made a strategic decision not to include it. Given that strategic decisions are "virtually unchallengeable," *Strickland v. Washington*, 466 U.S. 668, 690 (1984), the Court finds that this cannot be grounds for finding deficient performance.

The jury sentenced Mr. Fisher to death on the basis of a sole aggravating factor outweighing a sole mitigating factor. Had counsel marshaled the information and had the jury heard the (compelling) story of Mr. Fisher's life and psychological distress, there is a

27

"reasonable probability" that it would have sentenced Mr. Fisher to life without parole instead of death. *See Id.* at 703. Therefore, the Court grants the writ on this ground, but only as to the failure to investigate. Before delving into the law, the Court must first address the threshold question of expanding the record, and then must outline Mr. Fisher's past and summarize the story that the jury never heard.

## A. Expansion of the Record

Mr. Fisher asks the Court to expand the record, arguing that his claim for ineffective assistance of counsel was not adjudicated on the merits by the state court and therefore is not barred under § 2254(e). The Supreme Court of Pennsylvania held in *Fisher-4* that Mr. Fisher "fail[ed] to meet the burden of establishing that the [mitigating] evidence exists" and that "counsel cannot be deemed ineffective." *Fisher-4*, 813 A.2d at 771. Although the state court purportedly adjudicated the ineffectiveness claim on the merits, it made this ruling after denying Mr. Fisher funds to investigate mitigating evidence for his PCRA claim.

Mr. Fisher asks the Court to expand the record, but the Commonwealth claims this is barred by AEDPA. Under AEDPA, if "the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim" unless certain circumstances are met. 28 U.S.C. § 2254(e)(2). For subsection (e)(2) to apply at all, Mr. Fisher must have "failed to develop" the factual predicate for his claim. Under § 2254(e), "a failure to develop the factual basis of a claim is not established unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *Williams v. Taylor*, 529 U.S. 420, 432 (2000). That failure is not present here. Mr. Fisher petitioned for funds to investigate his ineffectiveness claim and was denied. Given that he was an indigent petitioner and his inability to investigate was not his fault, the Court finds that Mr. Fisher did not

28

"fail[] to develop the factual basis of a claim in State court proceedings," and the requirements of 28 U.S.C. § 2254(e)(2) are inapplicable.

Without guidance or limitation from AEDPA, the Court must turn to Rule 7 of the Rules Governing Section 2254 Cases, which allows the Court to expand the record so long as the respondent is permitted to address the veracity of the claims. Rule 7, RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS, 9 (2010). Mr. Fisher seeks to expand the record to include the affidavits from his military expert, his neuropsychologist, his forensic psychiatrist, friends and family. The Commonwealth never disputed the veracity of the claims, but instead argued that they simply would add nothing to the analysis. After the Commonwealth declined to dispute these claims in the briefing, the Court gave the Commonwealth leave to file supplemental briefing after oral argument if it wished. Again, the Commonwealth declined to file any briefing.

Given that the Commonwealth has made the decision to not challenge this information despite ample opportunity to do so, the Court finds that these items can be added to the record. *See, e.g., Pursell v. Horn*, 187 F. Supp. 2d 260, 381 (W.D. Pa. 2002) (expanding the record under the Rules Governing Section 2254 Cases when the facts were undisputed); *Jacobs v. Horn*, 129 F. Supp. 2d 390, 403 (M.D. Pa. 2001) (same); *see also Woods v. Dugger*, 923 F.2d 1454, 1460 (11th Cir. 1991) (holding that there is no need for an evidentiary hearing when the petitioner's habeas submissions demonstrate that the petitioner is conclusively entitled to relief because an evidentiary hearing "would be a waste of judicial resources").

The Commonwealth asserted during oral argument that, even if this alleged information were added to the record, *Cullen v. Pinholster*, 563 U.S. 170 (2011) still requires the Court to rule based only on the record presented at the state court. Therefore, the Commonwealth claims

29

that the Court cannot use this new evidence in determining whether the state court decision was unreasonable under 28 U.S.C. § 2254(d). This argument confuses the reviewing posture of the Court. The *Cullen* Court held that, because § 2254(d) requires determining whether the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," *id.* § 2254(d)(1), the reviewing federal court must consider only the record and law that was present when the state court addressed the issue. *Cullen*, 563 U.S. at 181–82. Section 2254(d) is framed in the past tense, and for the district court to determine if the state court's determination was unreasonable on the facts before the state court, the district court could not use *new* information that was not before the state court. *Id.* at 182. This makes logical sense from a plain reading of the provision; a state court cannot be unreasonable for failing to consider something that did not exist at the time.

But *Cullen* dealt with a determination under § 2254(d)(1), where the state court adjudicated the claim on the merits. In that instance, the district court was required to defer to the state court. But on the present question of ineffective assistance of counsel, by contrast, no deference is required under § 2254(d) because the state court did not adjudicate the ineffectiveness claim on the merits. Although the state court claimed to make a factual determination, it did so without giving Mr. Fisher funds to investigate the issue. In doing so, the state court placed Mr. Fisher in an impossible position: It denied the funds necessary to show prejudice in his ineffective assistance of counsel claim, while simultaneously holding that Mr. Fisher did not make an adequate showing of prejudice. In other words, the state court refused to give Mr. Fisher a rod, but blamed him when he did not catch a fish. Although it is a permissible practice for a state court to refuse funds for investigation, the empty record cannot then be adjudication on the merits, given that Mr. Fisher's counsel requested funds to pursue his claim

and was denied.[8] AEDPA seeks to "ensure that petitioners who diligently developed the factual basis of their claims in state court . . . retain the ability to access the Great Writ." *Cullen*, 563 U.S. at 210 (Sotomayor, J., dissenting). Mr. Fisher did precisely that.[9] Therefore, the state court opinion deserves no AEDPA deference. *Cf Martinez v. Ryan*, 566 U.S. 1, 9 (2012) (finding that a federal court can adjudicate an ineffective assistance of counsel claim if the prisoner can establish cause sufficient to excuse failure to raise the claim below).

The Court's holding here — that the claim was not adjudicated on the merits, and therefore requires no deference — should not be taken to mean that the state court's ruling was incorrect on the facts before it. Nor should it be construed to say that the state court's practice of limiting funds is impermissible. Deference to the state court is an important component of federal habeas law. Comity dictates that the decisions made there be accorded deference, a principle that AEDPA codified throughout § 2254. But this deference, however robust, cannot extend to state courts that never consider the question.

Many state courts do not have systems in place to review questions of federal law, nor are they required to. *See Trevino v. Thaler*, 569 U.S. 413, 421 (2013) ("[F]ederal habeas corpus principles [are] designed to prevent federal courts from interfering with a State's application of its own firmly established, consistently followed, constitutionally proper procedural rules."). States may provide robust collateral review, limit it as they see fit, or decline collateral review

---

[8] A contrary holding would have the practical effect of eliminating federal habeas review for indigent defendants who had an evidentiary hearing on anything in state court, even if such a hearing was woefully inadequate, or was limited in its scope.

[9] Even if the Court did adjudicate the claim on the merits, it would fail because it was "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," 28 U.S.C. § 2254(d)(1), based on the information that was present before the state court. No fair-minded jurist could conclude that an ineffectiveness claim had failed when the very tools to discover the necessary evidence were withheld by the government.

altogether. In determining allocation of resources for indigent prisoners, states must balance many factors. Pennsylvania has decided that its limited funds should not be allocated for experts to review Mr. Fisher's ineffectiveness claim, and the Court does not second-guess or critique the choice of the state legislature. However, Pennsylvania's decision entails the concomitant conclusion that the federal courts must decide the question without deference to the state court's decision. Because Mr. Fisher was not given adequate funds to pursue his ineffectiveness claim, there is no actual decision *on the merits* for the Court to defer to. The Court therefore (a) must review the case *de novo* and (b) may consider the added evidence to the record in determining prejudice.

### B. Mr. Fisher's Story

What follows is information from the expanded record. The expanded record paints a compelling picture of a man with a troubled history, but it is a story that his lawyer failed to investigate. Because of this failure, there is a reasonable probability of a different result in Mr. Fisher's sentencing proceeding if the information had been presented. *Strickland*, 466 U.S. at 703.

#### 1. Life History

Robert Fisher was born in 1946 and grew up in Norristown, Pennsylvania, raised between his parents and grandparents. Mr. Fisher's father was an alcoholic and his mother suffered a nervous breakdown that hospitalized her in a state institution when Mr. Fisher was in fourth grade. Mr. Fisher has a brother, a sister and two sons.

At the age of 17, Robert Fisher enlisted in the United States Army and served a three year term in Europe. He regularly advanced, and after his term expired, he left active duty with an honorable discharge into the Army Reserves. Six months after his honorable discharge, Mr.

Fisher again volunteered for the military, this time as a United States Marine in combat in Vietnam. The Marines sent Mr. Fisher to Vietnam to serve as a rifleman in a marine unit that later became known as "The Walking Dead." Eleven months into his service in Vietnam, Mr. Fisher was wounded by an enemy bomb. The explosion wounded his head, neck, chest and arms. He was hospitalized and awarded the Purple Heart for his injuries.

### 2. Expert Reports

For the purposes of this petition, Mr. Fisher retained several experts to evaluate his military injuries and the quality of his military service. Dr. John F. Guilmartin, an academic historian specializing in military history and a retired United States Air Force Lieutenant Colonel, analyzed Mr. Fisher's military records to determine both the severity and frequency of combat Mr. Fisher encountered in Vietnam, and whether he served with valor and success as a soldier. Dr. Guilmartin concluded that Mr. Fisher faced constant combat in Vietnam. During that time, he also incurred five to six disorderly conduct charges and charges for destroying property. Dr. Guilmartin's report contradicted prosecution witness Anthony Messico, a personnel officer at the Willow Grove Naval Station who testified that Mr. Fisher's unit did not experience combat.

Next, habeas counsel sought the services of Dr. Jonathan Mack, a neuropsychologist, who administered a variety of clinical tests and conducted a clinical interview with Mr. Fisher. Dr. Mack found indicia of brain injury and concluded that Mr. Fisher had symptoms of post-concussion syndrome. During Dr. Mack's interview, Mr. Fisher revealed that he suffered from constant headaches and tinnitus, for which he requested treatment from the military and received anti-psychotic medication rather than narcotic medication. Dr. Mack also diagnosed Mr. Fisher with post-traumatic stress disorder (PTSD) from his injury and time in Vietnam.

33

Finally, habeas counsel retained Dr. Robert Sadoff, a forensic psychiatrist, who conducted a mental health evaluation of Mr. Fisher. Dr. Sadoff had previously evaluated Mr. Fisher in 1988 to determine both his competency and the availability of an insanity or diminished capacity defense for Mr. Fisher's guilt phase trial.[10] The present evaluation, conducted in 2003 for this habeas petition, was to determine whether Mr. Fisher suffered from PTSD or drug addiction, which would have been mitigating factors in his sentencing. Mr. Fisher exhibited symptoms of PTSD for ten years after his return from Vietnam, but not at the time of his examination. To come to this conclusion, Dr. Sadoff relied on Mr. Fisher's recollection of the PTSD symptoms: nightmares, flashbacks, and hyper-reactive startle reactions. According to Dr. Sadoff, by 1980 (the year of the murder) Mr. Fisher had been using drugs, including heroin, methamphetamine, psychedelics, marijuana, and alcohol, to alleviate symptoms of PTSD. Relying on Mr. Fisher's recollection of the amount and kind of drugs and alcohol he consumed on the day of Ms. Rowden's murder, Dr. Sadoff concluded that Mr. Fisher was intoxicated for most of the day.

### 3. Affidavits of Family & Friends

In support of this petition, Mr. Fisher also submitted affidavits from various family members and lifelong friends who provided insight into who Mr. Fisher's personality before and after Vietnam. Harry Mobley, Jr., one of Mr. Fisher's childhood neighbors, noted that Mr. Fisher was "jovial, outgoing and the life of the party." Marsha Mobley Young, also a lifelong friend, characterized Mr. Fisher as "a nice person . . . a protective person who wouldn't let any of the neighborhood kids hurt one another in anger." When Mr. Fisher returned from Vietnam, Harry

---

[10] Although Dr. Sadoff was retained for the guilt phase and competency questions, he was not retained for the sentencing phase, which is at issue in this petition.

34

Mobley recalled track marks on Mr. Fisher's arms and a coldness in his gaze; Mr. Fisher was paranoid, agitated, "preoccupied and suspicious."

James Fisher, Mr. Fisher's older brother, stated that when he returned from Vietnam, Mr. Fisher was "changed." He was "less patient," "more argumentative," and "disrespectful." He had trouble keeping a job and "lost his motivation." James Fisher also noticed that Mr. Fisher was sometimes in pain and would complain about "severe headaches." Finally, James Fisher described his brother's drug use, explaining that Mr. Fisher behaved like "every night was Friday night."

Sherrill Fisher Moore is Robert Fisher's younger sister by eight years. She characterized him as a patient brother who would take the time to walk to school with her and taught her how to ride a bicycle. When he returned from war, Ms. Moore remembers that Mr. Fisher complained of headaches and said that he took drugs to try to stop the headaches. He argued with his family frequently; Ms. Moore felt like "he would just imagine that you were starting an argument when you would say anything."

### C. Mr. Fisher's Sentencing Proceeding

In Pennsylvania, after a first degree murder verdict is recorded and before the jury is discharged, the court conducts a separate sentencing hearing in which the jury determines whether the defendant is to be sentenced to death or life imprisonment without parole. 42 PA. CONS. STAT. § 9701(a). During the sentencing hearing, the parties present evidence of aggravating and mitigating circumstances. The jury is instructed that the verdict must be a sentence of death if it unanimously finds at least one aggravating circumstance and no mitigating circumstance, or if the jury unanimously finds one or more aggravating circumstances that outweigh any mitigating circumstances. 42 PA. CONS. STAT. § 9711(c)(iv). The verdict must be a

35

sentence of life imprisonment in all other cases. *Id.*; *see also Jacobs v. Horn*, 129 F. Supp. 2d 390, 400 (M.D. Pa. 2001) rev'd on other grounds, 395 F.2d 92 (3d Cir. 2005). Aggravating circumstances must be proven beyond a reasonable doubt and mitigating circumstances must be proven by a preponderance of the evidence.

Mr. Fisher's death sentence was predicated on the jury's finding that a single aggravating circumstance,[11] the killing of a government informant, outweighed a single mitigating circumstance, "evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 PA. CONS. STAT. § 9711(e)(8). Mr. Fisher argues that adding additional mitigating circumstances would have had a reasonable probability of changing his sentence.

## D. Ineffective Assistance of Counsel Standard

Mr. Fisher argues that his counsel was ineffective for failing to investigate his military service and mental health history. A habeas petitioner's claims regarding ineffectiveness are evaluated under the test set forth in *Strickland v. Washington*, 466 U.S. 688 (1984).[12] The *Strickland* standard has two components. "First, the defendant must demonstrate that counsel's performance was deficient" by showing "that counsel's representation fell below an objective standard of reasonableness." *Medina v. Diguglielmo*, 461 F.3d 417, 427–28 (3d Cir. 2006) (quoting *Strickland*, 466 U.S. at 687–88). "Second, the defendant must show that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.

---

[11] 42 PA. CONS. STAT. § 9711(d)(15). This standard is discussed at length in the *ex post facto* section. *See* Section I, *supra*.

[12] *Strickland* was clearly established federal law at the time the claims of ineffectiveness were raised in the state court. *Outten v. Kearney*, 464 F.3d 401 (3d Cir. 2006); *see also Williams v. Taylor*, 529 U.S. 362, 391 (2000).

To show prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," *id.*, and is a "less demanding standard than the preponderance standard." *Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (citing *Baker v. Barbo*, 177 F.3d 149, 154 (3d Cir. 1999)); *see also Nix v. Whiteside*, 475 U.S. 157, 175 (1986). In other words, even if Mr. Fisher satisfies the first component by showing that counsel's performance was deficient, he cannot prevail if counsel's error "had no effect on the judgment." *Strickland*, 466 U.S. at 691.

## E. Discussion

Both sides agree that the failure to investigate Mr. Fisher's mental health and military history constitutes ineffective assistance of counsel. The Court finds that, as a whole, counsel's failure constitutes deficient performance, and the state court decision to the contrary was an unreasonable application of established Supreme Court precedent. Given that there was only one aggravating circumstance and one mitigating circumstance at the sentencing, a failure to investigate mental health evidence, in conjunction with the other failures, shows a reasonable probability that competent counsel could have avoided a death sentence. The discussion that follows tracks *Strickland*'s two-part test. First, the Court discusses counsel's deficient performance. Second, the Court discusses whether prejudice resulted from that deficient performance. Although counsel's deficient performance is not in dispute (both parties agree it violates the minimum standards required by the Sixth Amendment), a detailed discussion of the contours of counsel's deficiency is necessary to determine whether those failures prejudiced Mr. Fisher.

37

## 1. *Deficient Performance: Failure to Investigate Mental Health Evidence*

Both sides agree that counsel was ineffective in failing to investigate that Mr. Fisher's mental health issues, largely stemming from his time in Vietnam. Sentencing counsel had reason to know that (1) there was a drastic change in Mr. Fisher's personality after his return from combat, (2) Mr. Fisher turned to drug use because of his severe headaches, and (3) one of Mr. Fisher's previous lawyers sent Mr. Fisher for mental health assessments during the guilt phase of his trial. These three facts should have prompted counsel to have Mr. Fisher evaluated for mental health impairments. As outlined above, Drs. Mack and Sadoff concluded that Mr. Fisher suffered from PTSD after his return from Vietnam. If this evidence had been introduced at his sentencing hearing, a reasonable juror could have found that mitigating factors (e)(2), that "the defendant was under the influence of extreme mental or emotional disturbance," or (e)(3), that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired," had been met by a preponderance of the evidence. *See* 42 PA. CONS. STAT. §§ 9711(e)(2); (e)(3).

In support of this claim, Mr. Fisher cites the *Williams*, *Wiggins*, and *Rompilla* trio of cases. In all three cases, the Supreme Court held that counsel was ineffective for failing to investigate mental history.[13] In *Wiggins*, the sentencing counsel commissioned a pre-sentencing report, interviewed family members, retained a psychologist, retained a criminologist to evaluate the defendant, and found records from social services. *Wiggins v. Smith*, 539 U.S. 510, 523–24

---

[13] *Wiggins* and *Rompilla* were decided after the claims were presented to the state court, which would normally mean that the Court could not consider these cases under AEDPA. *See* 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003) ("'[C]learly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court *at the time the state court renders its decision*." (emphasis added)). However, as discussed above, § 2254(d)(1) does not apply here. Therefore, the Court may look to current law to determine the ineffectiveness standard.

(2003). Despite these efforts, the Court held that counsel had only a "rudimentary knowledge of [Wiggins'] history from a narrow set of sources." *Id.* at 524. Similarly, in *Rompilla*, the Court found deficient performance even though the attorney conducted "interviews with Rompilla and [five] members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase." *Rompilla v. Beard*, 545 U.S. 374, 381 (2005). The Court found counsel's performance to be deficient because counsel failed to consult school records, criminal records, and the defendant's history of alcoholism. *Id.* at 382.

Both cases relied on the ABA standards for assistance of counsel in capital cases. Courts look to these standards as "guides to determining what is reasonable" in assessing the proper standards for counsel. *Wiggins*, 539 U.S. at 524 (quoting *Strickland*, 466 U.S. at 688). ABA guideline 11.4.1 governs the effective assistance of counsel in capital cases. Counsel must make "efforts to discover all reasonably available mitigating evidence" and "conduct independent investigations relating to the guilt/innocence phase and to the penalty phase of a capital trial." ABA Guideline 11.4.1 (1989). When "necessary or appropriate," sentencing counsel should "secure the assistance of experts" for the "presentation of mitigation." *Id.* at 11.4.7.

Here, sentencing counsel's performance was deficient because counsel was aware of Mr. Fisher's mental health problems generally, but never investigated any specifics. Although the decision to *present* such evidence would be a strategic decision, the lack of any *investigation* in the first instance constitutes deficient performance. The diligence exhibited in *Wiggins* and *Rompilla* was not present here, and in those cases the Supreme Court found that counsel was ineffective.

The Commonwealth spent considerable time arguing that *Williams*, *Wiggins*, and *Rompilla* should not be applied retroactively to this collateral review of the 1997 sentencing

39

hearing. It cites *Teague v. Lane*, 489 U.S. 288 (1989), and *Warren v. Kyler*, 422 F.3d 132 (3d Cir. 2005) to imply that the trio of *Williams*, *Wiggins*, and *Rompilla* do not show that the Supreme Court of Pennsylvania's application of law was contrary to clearly established federal law. The Commonwealth argues that those cases represent new procedural rules, and under *Teague*, cannot be applied retroactively. This argument misstates the law. Although these cases do post-date the direct appeals, they did not alter any clearly established law. Each case relied on the *Strickland* standard to frame the ineffectiveness problem. Moreover, *Wiggins* and *Rompilla* (as well as many other ineffectiveness decisions decided later) rely on *Williams*, a case that was decided by the Supreme Court after Messrs. Wiggins' and Rompilla's convictions were final. In any event, the Court is not bound by the Supreme Court of Pennsylvania's determination, *see* Section II.A., *supra*, and may consider these cases.

Therefore, the Court finds that counsel was ineffective for never investigating Mr. Fisher's past mental health conditions at the sentencing phase, especially in light of the wealth of information available from the guilt phase of the proceedings.

## 2. *Deficient Performance: Failure to Present Evidence of Intoxication*

Mr. Fisher next points to counsel's failure to elicit testimony of his intoxication on the day in question. Had such evidence been introduced, the jury could have found mitigating factor (e)(3), that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired." 42 PA. CONS. STAT. § 9711(e)(3). Sentencing counsel explained that he decided not to present that evidence because it was inconsistent with Mr. Fisher's claim of innocence. Mr. Fisher now claims that because this was the sentencing phase, the jury was instructed to presume he was guilty. Therefore, the

40

rationale by sentencing counsel was wrong, and the failure to present this mitigating evidence constitutes deficient performance.

The Commonwealth argues that the state court correctly determined that this evidence would not rise to the level of meeting mitigating factor (e)(3), because two experts had previously "indicated that [Mr. Fisher's] capacity was not diminished on the day of the murder." *Fisher-3*, 741 A.2d at 1246. In other words, the Commonwealth focuses on prejudice, the second part of the *Strickland* test. This can only be analyzed after the Court makes a threshold determination on whether performance was deficient.

Here, the Court finds that there was no deficient performance as to this point. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Sentencing counsel's decision to not present this evidence was a strategic decision. Sentencing counsel weighed the pros and cons of presenting this mitigating factor and decided that it would be better to have the jury think that Mr. Fisher was possibly innocent. Moreover, presenting a case at the sentencing phase that contradicts the guilt phase arguments could risk losing credibility with the jurors, both in Mr. Fisher's testimony and in counsel's overall presentation. Because it was a strategic decision, the Court finds this argument without merit.

### 3. *Deficient Performance: Failure to Investigate Military Record*

Mr. Fisher finally argues that his sentencing counsel should have investigated his military record to rebut the Commonwealth's contention that he did not face significant combat. He points to a report filed with his habeas petition written by a military historian who testified (in general terms) about the level of combat Mr. Fisher's unit saw throughout Vietnam. Mr. Fisher claims that the failure to investigate rebuttal evidence here was ineffective assistance.

The Commonwealth argues that the evidence submitted by Mr. Fisher amounts to nothing more than generalizations that are not particularized to Mr. Fisher. Therefore, they are irrelevant. Although the Court disagrees that these are irrelevant, the Court does agree that these deficiencies do not rise to the level of ineffective assistance. Mr. Fisher testified about his experiences, and sentencing counsel used an expert to try and find people who served with Mr. Fisher (to no avail). The fact that counsel did not find an expert to refute the Commonwealth's information about Mr. Fisher's military record is too small of an issue to amount to ineffective assistance. Ineffective assistance of counsel is only cognizable if the performance fell below the minimum standard of care required by the Sixth Amendment. The "inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland*, 466 U.S. at 688. The Sixth Amendment does not require counsel to be flawless, run down any possible lead, or expend limitless resources when counsel is inherently limited by both time and money. Counsel need not necessarily have retained a military expert when Mr. Fisher had already testified to his particularized evidence. Therefore, the failure to do so — although less than sterling representation — does not violate the Sixth Amendment.[14]

---

[14] Although this failure alone does not rise to the level of ineffective assistance of counsel, Mr. Fisher's lawyer certainly could have done better. This fact buttresses the Court's earlier discussion of deficient performance and underlies how Mr. Fisher has satisfied the first prong of *Strickland*. Deficient performance need not be viewed on a decision by decision basis, but rather on a holistic view of counsel's actions. Although one action may lead to ineffectiveness (such as a wholesale failure to investigate, as outlined above) a number of small errors in the aggregate may lead to ineffective assistance. Indeed, the cumulative error doctrine contemplates this very notion by requiring courts to aggregate different constitutional violations to determine if the *Brecht* prejudice standard is met. *See Fahy v. Horn*, 516 F.3d 169, 205 (3d Cir. 2008) ("Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process."); *Albrecht v. Horn*, 485 F.3d 103, 139 (3d Cir. 2007) ("We recognize that errors that individually do not warrant habeas relief may do so when combined.").

Even if counsel's failure to secure a military expert were added to the Court's calculus in determining deficient performance, such failure would not be prejudicial. There was only one aggravating factor found by the jury — that Mr. Fisher had killed a witness to a crime. Mr. Fisher only argues that counsel was ineffective for failing to *rebut* the Commonwealth's evidence about his military record, but the jury never found an aggravating sentencing factor relating to his military record. Given that there was no mitigating circumstance for military evidence, the only way in which this evidence would have aided Mr. Fisher would have been to rebut the Commonwealth. Given that the jury never found an aggravating factor relating to this evidence, Mr. Fisher cannot be prejudiced by failing to rebut it — he already succeeded on that front.

### 4. Prejudice: Mental Health Evidence

Given that the only claim above that amounts to deficient performance is counsel's failure to investigate mental health evidence, the next question is whether that failure to investigate prejudiced Mr. Fisher. The Court finds that it did. There was only one aggravating circumstance and one mitigating circumstance, and, had the jury found a second mitigating circumstance, the Court finds there is a "reasonable probability" of a change in the outcome. *Strickland*, 466 U.S. at 669 (requiring a reasonable probability of a change in outcome to

---

Although these cases dealt with the *Brecht* standard requiring "substantial and injurious effect" of constitutional errors, *see Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), the *Brecht* standard is very similar to the *Strickland* requirement that the errors of counsel resulted in a "reasonable probability" of a change in outcome. *Strickland*, 466 U.S. at 669. Both sound in due process and attempt to determine whether the error undermines confidence in the outcome of the proceedings. Thus, failures by counsel may be viewed holistically to determine if they meet the minimum standard of competency required by the Sixth Amendment. Even if the failure to investigate mental health evidence had not risen to the level of ineffective assistance, these two failures in combination surely would have. However, given the fact that Mr. Fisher was only prejudiced by one of these two failures, the Court will focus on the mental health evidence failure.

43

establish prejudice). *Strickland*, the seminal case establishing ineffective assistance claims, found that the petitioner did not meet the prejudice requirement because there were "overwhelming aggravating factors [such that there was] no reasonable probability that the omitted evidence would have changed the conclusion" regarding sentencing. *Id.* at 700. That case stands in stark contrast to Mr. Fisher's. The only aggravating circumstance the Commonwealth offered here was that the victim was a potential witness to a trial.[15] Had all of this information been presented to a jury, there is a "reasonable probability" that the proceedings would have been different, because Mr. Fisher could have proven countervailing mitigating factors.

The Commonwealth asserts that the mental health evaluations performed by Drs. Mack and Sadoff do not provide any new mitigating evidence because Mr. Fisher had already testified to the fact that he received a "traumatic head injury" from a grenade, became addicted to heroin and was "heavily involved" with other drugs, and that the symptoms from his head injury lasted "over a decade." Further, the Commonwealth argues Drs. Mack and Sadoff's diagnoses of PTSD add nothing new, because Dr. Sadoff had previously made the same diagnosis in his guilt phase evaluation.

The Commonwealth's points all go to the weight of the evidence but are ultimately unavailing. The imprimatur of an expert testifying as to Mr. Fisher's mental health is far more persuasive than Mr. Fisher, a defendant who has an interest in the outcome, testifying to similar facts. There is a reasonable probability that, had Mr. Fisher's counsel investigated this issue, the outcome of the case would have been different and the jury may not have sentenced Mr. Fisher to death. Therefore, because his counsel's ineffectiveness prejudiced Mr. Fisher by leading to a

---

[15] As discussed above, this aggravating factor also violated the *Ex Post Facto* Clause, which constitutes an independent reason as to why Mr. Fisher is entitled to relief. *See* Section I, *supra*.

44

reasonable probability of a changed outcome in the case, Mr. Fisher is entitled to relief on this claim.

## GUILT PHASE CLAIM

### I.     Background & Procedural Default

Mr. Fisher's final claim is that the trial court's instruction on "beyond a reasonable doubt" was constitutionally infirm because it inaccurately explained the concept, and that trial counsel was ineffective for failing to object. The state court determined that Mr. Fisher's claim failed because, "[v]iewing the lengthy charge on reasonable doubt as a whole, it clearly and accurately stated the law, and there was no error." *Fisher-4*, 813 A.2d at 770. Therefore, reasoned the state court, counsel "cannot be deemed ineffective for failing to object or to raise this issue in prior proceedings." *Id.* Although this issue comes to the Court in an ineffectiveness posture, the state court's entire rationale for denying Mr. Fisher's claim was that the instruction accurately stated the law. Therefore, the Court will focus on whether that determination was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). The Court finds that the state court determination was unreasonable, and Mr. Fisher's claim should be granted.

The Commonwealth argues that Mr. Fisher defaulted on this issue by not raising it on direct appeal or in his first PCRA petition. Mr. Fisher raised the issue for the first time in his second PCRA petition. This argument misunderstands AEDPA's procedural requirement. AEDPA bars a federal court from granting a claim "unless it appears that the [] applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1). "An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any

45

available procedure, the question presented." 28 U.S.C. § 2254(c). In other words, under AEDPA, if the state court has adjudicated the question, or there is a procedural bar to the state court ever hearing the question, the federal court may adjudicate the claim. Mr. Fisher validly presented his reasonable doubt claim to the state court in his second PCRA petition, and the state court adjudicated it on the merits. Given that his federal habeas petition was timely filed, there is no procedural bar.

If the Commonwealth believed Mr. Fisher defaulted on his objections to the "beyond a reasonable doubt" instruction by failing to raise the argument until his second PCRA petition, the Commonwealth should have made that argument to the state court at that time. Whether or not there were exhaustion hurdles at the state level is a procedural question of state law. Perhaps there was an argument to be made at the PCRA hearing that Mr. Fisher had defaulted on his claim. If it was made, the state court rejected it and adjudicated the claim on the merits. In other words, if the exhaustion argument was ever made, the state court rejected it. Such a rejection amounts to a (binding) state court holding that Mr. Fisher was not procedurally barred. Indeed, that is why AEDPA itself only requires that "it *appear*" an applicant's remedies have been exhausted. 28 U.S.C. § 2254(b)(1) (emphasis added). The most reliable indicator for that appearance is that the state court heard the claim on the merits. Therefore, the federal court may hear the claim too.

The "exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). The only relevant question is "what procedures are 'available' under state law." *Id.* at 847 (quoting 28 U.S.C. § 2254(c)). Given that

46

Mr. Fisher's claim was litigated in state court, he may validly bring this claim before a federal court and there are no exhaustion hurdles for Mr. Fisher.

## II. Beyond a Reasonable Doubt Standard

An inadequate reasonable doubt instruction violates due process because the government must prove beyond a reasonable doubt every element of a charged offense. *In re Winship*, 397 U.S. 358, 361 (1970). Although the standard of beyond a reasonable doubt "is an ancient and honored aspect of our criminal justice system, it defies easy explication." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994). In assessing the reasonable doubt instruction, "[t]he important question is whether there is a 'reasonable likelihood' that the jury was misled or confused by the instruction, and therefore applied it in a way that violated the Constitution." *Victor*, 511 U.S. at 29 (Ginsburg, J., concurring) (citing *Boyde v. California*, 494 U.S. 370, 380 (1990)).

The guiding Supreme Court precedent here is *Victor v. Nebraska*, 511 U.S. 1 (1994), which upheld a reasonable doubt instruction despite problematic language. The Court unanimously held that the phrases "mere possible doubt" and "moral certainty" were permissible phrases to use in the instruction. However, the Court took issue with equating a reasonable doubt to a "substantial" doubt, because that lowered the state's burden of proof. *Id.* at 17–21. Despite this flaw, the Court found that the surrounding language adequately explained the concept of reasonable doubt such that there was no reasonable likelihood the jury would be misled or confused. *Id.* at 22–23. Notably, the instructions analyzed in *Victor* were short — only about a paragraph long — and the petitioners only challenged a few adjectives in each.[16] In other words,

---

[16] *Victor* was a consolidated set of cases where the Court analyzed two similar reasonable doubt instructions.

47

the *Victor* Court rejected the notion that one or two impermissible words would mislead the jury when the concept was generally explained correctly.

Cases since *Victor* have fallen in line with this general principle that the instruction must be read as a whole. For example, the Third Circuit Court of Appeals has upheld jury instructions where the judge correctly explained reasonable doubt, despite at one point referring to a "substantial doubt." *West v. Vaughn*, 204 F.3d 53, 57 (3d Cir. 2000). Similarly, although a jury "must" acquit upon a finding of reasonable doubt, the Third Circuit Court of Appeals has also upheld use of the word "should" instead of "must." *United States v. Dufresne*, 58 Fed. App'x 890, 901 (3d Cir. 2003); *see also Brown v. Folino*, 179 Fed. App'x 845 (3d Cir. 2006) (upholding short jury instructions that gave little clarification.)

However, in *United States v. Hernandez*, the Third Circuit Court of Appeals held that a trial court's instruction was unconstitutional when the court defined proof beyond a reasonable doubt as "what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt" and explained that it is "what you feel inside." 176 F.3d 719, 729 (3d Cir. 1999). The Court struck this down even though it was a pretrial instruction that comprised only 7% of the *pretrial* instructions on reasonable doubt. This pretrial instruction even included a caveat that the concept would be explained further after the trial, and when the error was objected to, the trial judge immediately corrected it. The post-trial jury instructions conformed to the standard jury instructions and adequately explained reasonable doubt. *Id.* at 729–35. Despite these steps, the Third Circuit Court of Appeals held that a "likelihood of confusion remained as to the quantum of evidence necessary to sustain a conviction, and the level of certainty that a juror had to have as to the defendant's guilt, because

48

the original explanation of reasonable doubt may well have remained in the juror's minds." *Id.* at 732.

The court further held that the clarifying language was insufficient to rectify the overall instruction, explaining that "'[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity.'" *Id.* at 733 (quoting *Francis v. Franklin*, 471 U.S. 307, 322 (1985)). In other words, even though the statements were corrected, "the jury was never instructed to ignore" the previous statements, and therefore it was impossible to know which concept of reasonable doubt the jury applied. *Hernandez*, 176 F.3d at 733.

Not every constitutional error in a criminal trial requires reversal. *See Chapman v. California*, 386 U.S. 18 (1967) (outlining the harmless error doctrine). However, if the jury instruction on reasonable doubt is constitutionally deficient, the defects can never be harmless, because the instruction underlies every decision the jury makes, "unquestionably" qualifying as a "structural error." *Sullivan v. Louisiana*, 508 U.S. 275, 280–82 (1993). Therefore, an error in the reasonable doubt jury instruction necessitates vacating Mr. Fisher's guilty verdict and remanding for retrial.

## III. Discussion

Mr. Fisher claims that the jury instruction on reasonable doubt was constitutionally infirm. The jury instruction in its entirety read:

> Now, what is reasonable doubt? A reasonable doubt, a word that I have used throughout this charge, is a doubt that would cause a reasonably careful and sensible person to pause and hesitate before acting upon a matter of importance in his or her own affairs. Let me repeat it. A reasonable doubt is a doubt that would cause a reasonably careful and sensible person to hesitate before acting upon a matter of importance in his or her own affairs.

49

Let me put this in a criminal context and then in a civil context for you by example. Suppose you were not a sequestered jury and suppose you were going down the hallway of the courtroom and you ran into somebody whom you had not seen for years.

And they said, "Hello. How are you doing? What are you doing here?"

And you say, "Well, I'm serving as a juror in a case," say a rape case.

And they said, "Oh, yes. I've heard about that through the rumors in the courthouse. Well, how did you decide?"

And you say, "Well, the Judge instructed me not to deliberate before I get all the evidence in, and all the evidence is in, but we haven't had the Charge of the Court, and I'm not at liberty to talk to you about this, because I haven't deliberated, and I really don't know at this point."

Well, at this point, of course, there would be reasonable doubt, because you hadn't brought your skills to the charge and to the evidence that you had heard. In other words, you had reasonable doubt at that point because you really hadn't gone into any deliberations, and the presumption of innocence stood — still stood.

And suppose you were in the supermarket two weeks later and you ran into the same person, the first time you had seen this person in ten years except in the courthouse, but you ran into him within a month two different times. And they said, "Well, whatever happened to that?"

"Well, we got the Charge of the Court and we all deliberated, and we unanimously came to the conclusion that the Commonwealth had proved its case, and we found the Defendant guilty of the crime as charged."

At that point, when you had deliberated and found the person guilty of the crime charged, you had gone beyond a reasonable doubt. Well, at this point, when you told about your firm conviction that you had come to after all the evidence and the law was at your fingertips, then you were beyond a reasonable doubt.

50

Let me put it in a civil context for you. Suppose you and your wife, you and your husband were arguing back and forth whether or not to send a child of yours to private school, sending the child to private school at considerable havoc to your personal budget, and if you did send this child to a private school, it would be a considerable inconvenience to you and sacrifice. And you were arguing back and forth as to the pluses of going to private school, small classes, individual attention, ability to participate in all of the activities and maybe the greater demands and more personal instructions versus a wider distribution of persons from all areas of the community versus the better equipment that may be provided by the public tax dollars and, perhaps, the ability to get rubbed up a little bit with all levels of society versus not so. And suppose, after discussing this with your wife or your husband, as the case may be, after two weeks, you really didn't make any determination whether you wanted to send the kid to private school or not. But suppose you continued on this discourse and you talked about if for another two weeks. And suppose two weeks transpired, you came to the firm conclusion that it was more advantageous to send this child to private school, even though it was going to cause some havoc to your personal budget but that the advantages outweighed the disadvantages and you were firmly committed to send this child to private school. It was at this point in this very important decision in your own private lives that, after great logic, reasoning and rationale and everything else being applied to this particular problem, that you came to the firm conclusion that you were going to send this child to private school. It would be at that point, after you had come to that firm conclusion, you had done something about it, that you would have gone beyond a reasonable doubt.

Now, I gave you two examples. Reasonable doubt must fairly arise out of the evidence that was presented or out of the lack of evidence that was presented with respect to some element of the crime. A reasonable doubt must be a real doubt. It may not be an imagined one or conjured up in order to avoid carrying out an unpleasant duty.

So, to summarize, you may not find the Defendant guilty based on a mere suspicion of guilt. The Commonwealth has the burden of proving the Defendant guilty beyond a reasonable doubt. If it meets the burden, then the Defendant is no longer presumed to be innocent and you should find him guilty. On the other hand, if the Commonwealth does not meet its burden, then you should find him not guilty.

51

The Commonwealth's burden, as I said, is to prove the Defendant's guilt beyond a reasonable doubt, but it does not mean that the Commonwealth must prove the utter impossibility of the Defendant's innocence or the Defendant's guilt to a mathematical certainty, nor must it prove the Defendant's guilt beyond all doubt. The Commonwealth's burden to prove the Defendant guilty beyond a reasonable doubt does not mean that the Commonwealth must prove the Defendant's guilt to a moral certainty.

A reasonable doubt cannot be fancied or conjured up in the mind of the jury, as I said, to escape an unpleasant duty. It must be an honest doubt arising from the evidence, itself, the kind of doubt that would restrain a reasonable man from acting in a matter of importance to himself or herself, a reasonable woman.

A reasonable doubt is not caused by sympathy or compassion for the Defendant or others who may be affected by the verdict against him. That is, it must not be a doubt that arises out of the juror's head but one which arises in his mind after considering the evidence, that is, that the juror is not at any time in his deliberations in this case to allow himself to conjure up a doubt in order to avoid the performance of a disagreeable duty or to be controlled by hesitancy over the decision of a point which he would not consider a matter of doubt or hesitate to decide if it arose in an affair of importance to himself or herself.

June 28, 1991 Trial Testimony, 21–24.

The trial court's instruction falls into three separate categories, each of which account for approximately one third of the instruction. Two of these categories are examples used by the trial court to illustrate the concept of reasonable doubt. The third category is the surrounding language of the instruction. The Court concludes that these two examples are seriously flawed examples to illustrate the concept of beyond a reasonable doubt, and the surrounding language is insufficient to "cure" the instruction, rendering it constitutionally flawed. No reasonable jurist could find this to be an adequate instruction, and therefore the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

## A. Example #1: The Grocery Store

After saying a brief preamble about reasonable doubt, the trial judge went into the first of

two examples:

>Suppose you were not a sequestered jury and suppose you were going down the hallway of the courtroom and you ran into somebody whom you had not seen for years. And they said, "Hello. How are you doing? What are you doing here?"
>
>And you say, "Well, I'm serving as a juror in a case," say a rape case.
>
>And they said, "Oh, yes. I've heard about that through the rumors in the courthouse. Well, how did you decide?"
>
>And you say, "Well, the Judge instructed me not to deliberate before I get all the evidence in, and all the evidence is in, but we haven't had the Charge of the Court, and I'm not at liberty to talk to you about this, because I haven't deliberated, and I really don't know at this point."
>
>Well, at this point, of course, there would be reasonable doubt, because you hadn't brought your skills to the charge and to the evidence that you had heard. In other words, you had reasonable doubt at that point because you really hadn't gone into any deliberations, and the presumption of innocence stood — still stood.
>
>And suppose you were in the supermarket two weeks later and you ran into the same person, the first time you had seen this person in ten years except in the courthouse, but you ran into him within a month two different times. And they said, "Well, whatever happened to that?"
>
>"Well, we got the Charge of the Court and we all deliberated, and we unanimously came to the conclusion that the Commonwealth had proved its case, and we found the Defendant guilty of the crime as charged."
>
>At that point, when you had deliberated and found the person guilty of the crime charged, you had gone beyond a reasonable doubt. Well, at this point, when you told about your firm

conviction that you had come to after all the evidence and the law was at your fingertips, then you were beyond a reasonable doubt.

June 28, 1991 Trial Testimony, 21–22.

Read in its best light, this example attempts to explain an incorrect statement of the law. It equates "beyond a reasonable doubt" with "when a jury is done deliberating." As Mr. Fisher correctly argues, the judge defined reasonable doubt as "a concept that existed only until the start of deliberations." Pet. Br. at 111. This is because the judge used the term "beyond" in the transitory sense, as in: "You must move beyond the hills to reach the stream on the other side." As used here, the trial judge says that being "beyond" a reasonable doubt means that you have moved from point A (not knowing the answer) to point B (conviction). This misunderstands the phrase "beyond a reasonable doubt." As used in the law, the word "beyond" in "beyond a reasonable doubt" simply means that the juror *has no more* reasonable doubts. In other words, the question for the jury is "what," not "when."

Part of this flaw was in the trial court's attempt to define "beyond a reasonable doubt" rather than focusing on the definition of what a "reasonable doubt" is. Standard instructions always discuss the definition of *reasonable doubt*, but they do not discuss what it means to *move beyond* a reasonable doubt. This is because it is impossible for a court to determine a legal standard for when there are no more reasonable doubts. A court can only articulate a legal standard for what a *reasonable doubt* is. The jurors must determine if there are no more reasonable doubts in their minds; the court cannot do it for them. For this reason, courts always define "reasonable doubt," but they never attempt to define what it means when the government has proven its case "beyond a reasonable doubt." Put simply: "beyond a reasonable doubt" is beyond definition.

This situation arises because, as most of us intuitively understand, it is nearly impossible to define the absence of "something" — one must instead explain what that "something" is. For example, it is quite easy to explain what a glass of water looks like — a clear cylindrical object filled with a clear liquid. But it is nearly impossible to explain what the *absence* of a glass of water is. The best one can do is to simply explain what a glass of water looks like, and ask the viewer to determine if that is present. Instead, the trial court here attempted to define the absence of reasonable doubts. Such an attempt is inherently confusing and, in this case, incorrect.

Finally, this example implies that either verdict — whether a conviction or an acquittal — must be proven beyond a reasonable doubt. The opposite is true: an acquittal only requires a single reasonable doubt. The jury need not find that Mr. Fisher was *innocent* beyond a reasonable doubt. For all of these reasons, this portion of the instruction was constitutionally deficient and embodied an incorrect statement of the law.

### B. Example #2: The School

The next example the trial court gives relates to the decision of whether to send a child to a school:

> Let me put it in a civil context for you. Suppose you and your wife, you and your husband were arguing back and forth whether or not to send a child of yours to private school, sending the child to private school at considerable havoc to your personal budget, and if you did send this child to a private school, it would be a considerable inconvenience to you and sacrifice. And you were arguing back and forth as to the pluses of going to private school, small classes, individual attention, ability to participate in all of the activities and maybe the greater demands and more personal instructions versus a wider distribution of persons from all areas of the community versus the better equipment that may be provided by the public tax dollars and, perhaps, the ability to get rubbed up a little bit with all levels of society versus not so. And suppose, after discussing this with your wife or your husband, as the case may be, after two weeks, you really didn't make any determination whether

you wanted to send the kid to private school or not. But suppose you continued on this discourse and you talked about if for another two weeks. And suppose two weeks transpired, you came to the firm conclusion that it was more advantageous to send this child to private school, even though it was going to cause some havoc to your personal budget but that the advantages outweighed the disadvantages and you were firmly committed to send this child to private school. It was at this point in this very important decision in your own private lives that, after great logic, reasoning and rationale and everything else being applied to this particular problem, that you came to the firm conclusion that you were going to send this child to private school. It would be at that point, after you had come to that firm conclusion, you had done something about it, that you would have gone beyond a reasonable doubt.

June 28, 1991 Trial Testimony, 23.

The Court finds this to be the most problematic part of the reasonable doubt instruction for four reasons. First and foremost, this is a description of the "preponderance of the evidence" standard rather than a "beyond a reasonable doubt" standard. The example describes an agonizing choice over which the parents are torn. Only after finding that the "advantages outweighed the disadvantages" did the parents decide to send the child to the given school. This is quintessential preponderance language, and it is a misstatement of the law for that reason alone. The trial judge himself appeared to think as much, when he began with "[l]et me put this in a civil context for you."

Second, the situations are wholly different. The question in the example from the trial court is simply *which* school to send a child to, not *whether* to send the child to school. Such a decision is markedly different than a criminal conviction, where a jury is asked to determine *whether* a defendant is guilty or not. The trial court's example implies that the jurors should be deciding which crime to convict him of, rather than deciding whether he committed a crime at all.

56

Third, a reasonable doubt instruction must be expressed "in terms of the kind of doubt that would make a person hesitate to act, rather than the kind on which he would be willing to act." *Holland v. United States*, 348 U.S. 121, 140 (1954) (citation omitted). This instruction was written in terms of what would cause a person to act.

Finally, the judge again makes the same conceptual error as above, explaining that "beyond a reasonable doubt" is a question of timing. As used in both of these examples, "beyond a reasonable doubt" means that a decision had been reached, not that there are no more reasonable doubts in the jurors' minds. By informing the jury that the burden of proof is met once they reach a decision, the court effectively eliminated the burden of proof entirely. The language "advantages outweighed the disadvantages," coupled with all of the surrounding flaws in the example, render this section fatally flawed.

### C. Surrounding Language

The Commonwealth gives scant attention to the reasonable doubt claim, devoting only two paragraphs in its 125-page brief to this question. The Commonwealth does not dispute any of Mr. Fisher's arguments about the two examples above and concedes that they are incorrect statements of law. The only argument the Commonwealth makes — which mimics the conclusory discussion by the state court — is that the statements are cured by the surrounding language. The Court disagrees.

Although *Hernandez* (discussed above) provides guiding precedent, the case of *Brooks v. Gilmore* bears discussion.[17] The instruction in that case was quite similar to the one here. The problematic instruction there said:

> It's helpful to think about reasonable doubt in this manner. Let's say, and I know that each one of you does have someone that you love very much, a spouse, a significant other, a child, a grandchild. Each one of you has someone in your life who's absolutely precious to you. If you were told by your precious one's physician that they had a life-threatening condition and that the only known protocol or the best protocol for that condition was an experimental surgery, you're very likely going to ask for a second opinion. You may even ask for a third opinion. You're probably going to research the condition, research the protocol. What's the surgery about? How does it work? You're going to do everything you can to get as much information as you can. You're going to call everybody you know in medicine: What do you know? What have you heard? Tell me where to go. But at some point the question will be called. If you go forward, it's not because you have moved beyond all doubt. There are no guarantees. If you go forward, it is because you have moved beyond all reasonable doubt.

*Brooks v. Gilmore*, No. 15-cv-5659, 2017 WL 3475475, at \*3 (E.D. Pa. Aug. 11, 2017) (McHugh, J.). Judge McHugh noted that although this example was surrounded with accurate language, such language was not enough to cure the example's flaws because this example "muddled or distorted" the standard. *Id.*

---

[17] The Court discusses *Brooks* as persuasive authority to exemplify "clearly established Federal law." 28 U.S.C. § 2254(d). Although *Brooks* post-dates the state court decision, the Court finds that the law applied in Mr. Fisher's PCRA proceeding was just as settled then as it is now. The Court is bound to assess the state court's ruling and measure it against the law at the time the state court decision was handed down in 2002. *See Yarborough v. Alvarado*, 541 U.S. 652, 661 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'") (citing *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003)). But the Supreme Court has not issued an opinion clarifying the law on reasonable doubt instructions since 2002, when Mr. Fisher's state PCRA petition was denied. Therefore, the Supreme Court law analyzed in *Brooks* is the same as the law analyzed by the state court in the PCRA petition. Of course, the Court does not find that the state court was unreasonable for failing to engage with *Brooks* (a decision that had not yet been handed down); however, the Court may turn to *Brooks* for authority as to what the Supreme Court has said on the question and how a reasonable jurist would interpret Supreme Court precedent. Therefore, there is no § 2254(d) issue in discussing *Brooks*.

The flawed examples in Mr. Fisher's case comprise 60% of the instruction (697 of 1,163 words). The same flawed example from Judge McHugh accounted for only 40% of the instruction. *Id.* at *5 n.6. Judge McHugh noted that "the initially accurate statement does not render the charge acceptable: the jury was instructed to consider the court's example as a proper exposition of the reasonable doubt standard — and it was not." *Id.* at *5. The lower court's story in *Brooks* was the centerpiece of the charge as an example of reasonable doubt. *Id.* Similarly, the problematic language in *Hernandez* comprised a mere 7% of the *pretrial* instruction, and none of the post-trial instructions. *See Hernandez*, 176 F.3d at 729 (outlining the full instruction). Nevertheless, both of those instructions were constitutionally flawed. Although the Court declines to require a mechanistic "percentage-based" approach to determining the validity of reasonable doubt instructions, this comparison is useful to show the focus that the trial court gave to the problematic language relative to the focus the trial court had on the correct standard.

Looking at the two instructions here, the one given to Mr. Fisher's jury suffers from greater flaws than the instructions in *Brooks* or *Hernandez*. The two examples cited by the *Fisher* trial court (especially the example about the school) are also the centerpiece of the charge, just like they were in *Brooks*. They comprise a greater share of the instruction (60% here versus 40% in *Brooks* and 7% in *Hernandez*) and the most problematic language of "weighing the advantages and disadvantages" used here was not present in *Brooks* or *Hernandez*. The language in *Brooks* and *Hernandez* were benign in comparison to the charge here.

The Court must look at the totality of the instruction to determine if it represents a "reasonable likelihood" that the incorrect standard was applied. *Victor*, 511 U.S. at 29. Here, the difference in the explanations means that there is a reasonable likelihood that the jurors applied the preponderance standard from the example, not the correct standard from the surrounding

language. Even ignoring the disproportionate focus on the flawed portions of the instruction discussed above, the flawed parts of the instructions were stories, but the non-flawed parts of the instruction were simple statements about what a reasonable doubt is. People more readily absorb information through stories, and there is ample research proving that individuals retain information better and engage with the material more fully when it is conveyed through a story as compared to the lecture format.

For example, a 1982 study compared the effectiveness of four different methods to persuade a group of M.B.A. students of an unlikely hypothesis. In the first method, there was just a story. In the second, the researchers provided statistical data. In the third, they used statistical data and a story. In the fourth, they offered the policy statement made by a senior company executive. Somewhat surprisingly, the most effective method was the first alternative, presenting the story alone. *See* J. Martin & M.E. Power, *Organizational stories: More vivid and persuasive than quantitative data*, B.M. STAW PSYCHOL. FOUND. OF ORG. BEHAV. (1982). Storytelling not only improves retention, but also shifts brain function from a "passive receiver of information []" into a state of active thinking." James Harbin & Patricia Humphrey, *Teaching management by telling stories*, 14 ACAD. OF EDUC. LEADERSHIP J. 91 (2010); *see also* Nancy Pennington & Reid Hastie, *A Cognitive Theory of Juror Decision Making: The Story Model*, 13 CARDOZO L. REV. 519, 558 (1991) (finding that jurors naturally construct stories when provided with evidence). [18]

---

[18] Communicating information through storytelling causes the listener's brain to engage on multiple levels. Paul Zak, *Why Your Brain Loves Good Storytelling*, HARV. BUS. REV. (October 28, 2014) https://hbr.org/2014/10/why-your-brain-loves-good-storytelling. The brain produces chemicals that sharpen focus and aid memory retention. *Id*. For this reason, sociological "experiments show that character-driven stories with emotional content result in a better understanding of the key points a speaker wishes to make and enable better recall of these points weeks later" than comparable information not told in a story. *Id*. This suggests that jurors are far more likely to connect with the stories in the jury instruction, as opposed to the conclusory legal statements made by the judge.

This data means that the jurors, in divining what a reasonable doubt is, likely retained the two incorrect stories by the judge, rather than his correct conclusory statements. Because here, as in *Hernandez*, "the jury was given two explanations of reasonable doubt [where one] was incorrect and one was not," the Court cannot "guess which definition the jurors adopted so long as there is a reasonable likelihood it chose the wrong one." *Hernandez*, 176 F.3d at 734. Therefore, Mr. Fisher's Constitutional rights were violated by this instruction.

## IV. The State Court Opinion and Ineffectiveness Posture

The entirety of the state court's analysis of this instruction states that, "[v]iewing the lengthy charge on reasonable doubt as a whole, it clearly and accurately stated the law, and there was no error. Counsel, therefore, cannot be deemed ineffective for failing to object or to raise this issue in prior proceedings." *Fisher-4*, 813 A.2d at 770. The Court finds that it was an unreasonable application of established Supreme Court precedent to (a) find that this instruction "clearly and accurately stated the law" and (b) find that counsel "cannot be deemed ineffective for failing to object." *Id*; 28 U.S.C. § 2254(d)(1). For the reasons stated above, the law on reasonable doubt instructions had been clearly established at the time of Mr. Fisher's second PCRA petition, so the state court's determination finding no fault with this flawed instruction was an unreasonable conclusion for that reason alone. However, it was also unreasonable for the state court to find that Mr. Fisher's counsel need not have objected.

To the contrary — given the blatant problems with this instruction, Mr. Fisher's counsel was ineffective for failing to object, and there is a reasonable probability of a different outcome in Mr. Fisher's guilt phase trial. Therefore, because this claim comes before the Court in an ineffective assistance of counsel posture, the Court finds that Mr. Fisher's claim has satisfied the prongs of *Strickland. See* Section III.D, *supra*. The failings outlined above underlie how

61

problematic it was for Mr. Fisher's counsel to fail to object, and any competent counsel would have objected at trial. This "structural error," *Sullivan*, 508 U.S. at 280–82, highlights that there is a reasonable probability of a changed outcome.

It is possible that not all structural errors satisfy the *Strickland* test. *Compare Torres v. Thaler*, 395 Fed. App'x 101, 103 (5th Cir. 2010) (refusing "to hold that a structural error alone is sufficient to warrant a presumption of prejudice in the ineffective assistance of counsel context"), *and Purvis v. Crosby*, 451 F. 3d 734, 743 (11th Cir. 2006) ("prejudice may not be presumed but must be shown in order to establish ineffective assistance of counsel based on the failure to raise a claim of structural error at trial"), *with Weaver v. Massachusetts*, 137 S. Ct. 1899, 1911 (2017) (assuming, but declining to hold, that structural error satisfies *Strickland* prejudice). However, the Court need not address the question of whether structural error necessarily results in a showing of prejudice under *Strickland*. In this instance, counsel's error of failing to object to the instruction resulted in a fundamentally unfair trial such that there is a reasonable probability of a changed outcome, which satisfies the *Strickland* test. To the extent the state court held otherwise, it was an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). Therefore, Mr. Fisher is entitled to a new trial.

## CONCLUSION

For the reasons cited above, Mr. Fisher's petition for a writ of habeas corpus is granted as to both his sentencing phase and guilt phase claims. As outlined in detail in the accompanying order, the Commonwealth must either release Mr. Fisher or begin retrial within 180 days of the date of this order.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE